IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-cr-27-MHT |
| | ) | [wo] |
| JOSE CRUZ | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This cause is before the Court on a *Defendant's Motion to Suppress* (Doc. 37), filed March 28, 2017 by Defendant Jose Cruz ("Defendant" or "Cruz"). The United States' filed its *Response to Defendant's Motion to Suppress* (Doc. 41, filed April 7, 2017). An evidentiary hearing was conducted on April 11, 2017. After the evidentiary hearing and due consideration of briefs, arguments, and applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to suppress.

### I.  FACTUAL BACKGROUND AND MOTION TO SUPPRESS

On January 13, 2017, Alabama State Trooper Tim Pullin ("Pullin") with the Motor Carrier Safety Unit, stopped a commercial truck at mile marker 14 on Interstate 85 in Montgomery, Alabama. Pullin stopped the truck to conduct a routine commercial vehicle inspection. The truck which was driven by Cruz was a 2010 Volvo 18 wheeler bearing California license number WP46982 and trailer tag 4NW8502. Pullin's sole reason to stop the truck was to conduct a Level III commercial vehicle inspection. Pullin is required to perform a certain number of inspections annually to maintain his certification with the Motor Carrier Safety Unit. Over the course of his law enforcement career, Pullin has conducted roughly 1,000 inspections.

Pullin spoke with Cruz and told him that he was conducting a Level III inspection of the vehicle. Level III inspections entail merely checking credentials and documents such as licenses,

log books, and bills of lading. Pullin saw that Cruz's log books were inaccurate, and had a discrepancy about who placed the seal on the back of the trailer loading. Cruz's explanation for being on I-85 in Montgomery, Alabama seemed implausible. Cruz told Pullin that he was headed to New Jersey from California to deliver the load. Pullin was skeptical that Cruz had a legitimate reason to travel through Montgomery, Alabama from California to reach New Jersey. The high cost of gasoline and the longer distance that traveling through Montgomery would entail made Pullin extremely suspicious. Cruz told Pullin that he had a load of frozen bagels and was en route to New Jersey. Cruz stated that he was on his way to Georgia to talk to another driver about finishing the drive to New Jersey. Pullin knew the direct route from the origin in California to the destination in New Jersey would be along I-40. Pullin became even more suspicious because he knew from his extensive training and experience that it was illegal for Cruz to have a passenger without authorization from the company.

From the outset, Pullin could see that the bill of lading did not match the log book. Pullin noted an inspection in Arizona also did not match the log books. The seal in the bill of lading did not match the seal on the back of the trailer. Pullin could plainly see that it was an after-market seal of the kind sold at truck stops. The seal was not from the shipper, yet Cruz insisted that the shipper had put it on the truck during loading. Pullin called the shipper and spoke with a warehouse manager to verify Cruz's statements. The shipper sent Pullin a text message with pictures of the shipper's seal to compare to the seal on the truck. Although it is not illegal for a driver to place his own seal on his truck or to take a small detour to reach a destination, based on his experience, Pullin felt that criminal activity was afoot.

Pullin asked for and received verbal consent from Cruz to inspect Cruz's load and to open the trailer. Cruz used his own pair of bolt-cutters to cut the seal and Cruz unlocked the

padlock. The padlock made Pullin more suspicious. Pullin knew that a low value load of frozen bagels would rarely have a padlock.

Once the doors were open, Pullin climbed into the trailer to check the load. Pullin saw two pallets of frozen bagels that were shrink-wrapped and placed side by side. Pullin noticed a puncture hole towards the top of the pallets and that there were footprints on the top of the load. Pullin saw that behind the pallets at the front of the trailer were additional boxes that were a different type of box than the bagel boxes. Pullin punched a hole in one of the boxes and pulled out a sealed bag of marijuana. At that time, Pullin arrested Cruz.

Pullin called for a driver to take the truck back to the Alabama Law Enforcement Agency ("ALEA") shop to conduct a thorough search of the tractor and trailer. ALEA Narcotics Agents Mark Barber ("Barber") and Angel Rodriguez ("Rodriguez") assisted Pullin in the search at the ALEA shop. Pullin and Barber found cardboard boxes containing marijuana in the front of the trailer.

After discovery of the boxes of marijuana, Barber and Rodriguez interviewed Cruz. Rodriguez speaks fluent English, but is a person whose native language is Spanish. Rodriguez read Cruz his *Miranda* rights in Spanish, and asked Cruz if he understood his rights. Cruz told Rodriguez that he understood his rights and that he would speak to the Agents. The interview was recorded and questions were asked in both English and Spanish. Cruz answered questions in both English and Spanish. ALEA Agents then obtained a warrant for trafficking marijuana and put Cruz in the Montgomery County jail. After closer examination of the suspicious boxes, Barber and Rodriguez found six kilograms of cocaine inside one of the boxes.

On March 28, 2017, Cruz filed his motion to suppress wherein he asserts (1) his statements were taken in violation of *Miranda* and (2) Pullin lacked probable cause for the initial

traffic stop. (Doc. 37). The United States timely filed its response on April 7, 2017. (Doc. 41).

Pullin and Rodriguez both testified at the suppression hearing on April 11, 2017. In addition, the prosecution played a recording of a portion of the interview conducted by Rodriguez. The pleadings, testimony, and exhibit were all considered in the Court's review of the suppression motion.

## II. DISCUSSION AND ANALYSIS

### A. Statements taken in violation of *Miranda*

Cruz argues that his post-arrest statements are inadmissible under *Miranda v. Arizona*. *Miranda* protects a person's Fifth Amendment privilege against self-incrimination by requiring law enforcement authorities to advise a person subject to custodial interrogation of certain rights and to respect the person's right to invoke those rights. *Moran v. Burbine*, 475 U.S. 412, 420 106 S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). A defendant may waive these rights, but only if "the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). The Supreme Court has established a two-part inquiry to determine whether the waiver was freely given:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran*, 475 U.S. at 421, 106 S. Ct. at 1141 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979)).

The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *United States v. Glover*, 431

F.3d 744, 748 (11th Cir. 2005). Although Cruz did not sign a *Miranda* waiver form, a signed waiver is but one piece of evidence the court considers in determining whether the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his rights. A signed *Miranda* waiver is usually strong evidence that the defendant waived his rights, but it is not necessary. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). Thus, failing to obtain a signed *Miranda* waiver alone is not proof that the defendant did not freely, knowingly, and intelligently waived his rights.

Cruz asserts that he was never advised of his *Miranda* rights in a language he could understand and that no waiver or interpretation of a waiver by Cruz was given knowingly, voluntarily, or intelligently. Cruz's argument falls short, as Rodriguez administered the *Miranda* warnings in Spanish. Importantly, during the recorded interview, Rodriguez refers to his reading of *Miranda* to Cruz and Cruz acknowledging that he read and understood them. Cruz does not at any point in the interview say or act as if he does not comprehend Rodriguez when Rodriguez asks Cruz if he remembered being read his rights and if Cruz understood them. Rodriguez, out of an abundance of caution, conducted portions of the recorded interview in both English and Spanish. Cruz responded to questioning in both English and Spanish, and did not appear confused or to lack understanding.

Based on the totality of the circumstances, the lack of any coercion by law enforcement, and lack of any evidence that Cruz did not voluntarily agree to waive his *Miranda* rights, this argument is due to be denied.

**B.     Lack of Probable Cause**

Cruz seeks suppression under the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Warrantless searches and seizures are per se unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576 (1967). "[O]ne such exception is enumerated in the Ala. Code § 32-9A-3[1] which permits the administrative inspection of commercial vehicles without a warrant. Therefore, the stop itself and the subsequent Level II inspection is permissible." *United States v. Rendon*, Crim. Act. No. 2:09-cr-48-WHA, 2009 WL 3052277, 2009 U.S. Dist. LEXIS 86410, *6-8 (M.D. Ala. Sept. 21, 2009). Here, Pullin's sole reason to stop Cruz was to conduct a Level III inspection. No requirement exists that a commercial vehicle inspector such as Pullin observe criminal conduct or a traffic offense as a prerequisite to stop the driver of a commercial vehicle to conduct a safety inspection. The Magistrate Judge credits Pullin that the sole reason that he stopped Cruz was to conduct a Level III inspection. Thus, Cruz's second argument is due to be denied as well.

### III.     CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the recommendation of the Magistrate Judge that *Defendant's Motion to Suppress* (Doc. 37) be **DENIED.** It is further

---

[1] Ala. Code § 32-9A-3 provides in full:

Any records required to be maintained by operators of commercial motor vehicles pursuant to state or federal laws or regulations shall be open to inspection during the normal business hours of a carrier by members designated by the director. The inspection may be made without a warrant. Members of the department designated by the director may also go on the property of an operator of a commercial motor vehicle to conduct inspections of facilities and records to ensure compliance with applicable state and federal laws and regulations governing commercial motor vehicle operations.

The director may promulgate reasonable rules and regulations relating to this chapter subject to the Alabama Administrative Procedure Act.

**ORDERED** that the parties shall file any objections to the said Recommendation not later than **May 1, 2017.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.* 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981)(*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 17th day of April, 2017.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE